**The court incorporates by reference in this paragraph and adopts as the findings and analysis of this court the document set forth below. This document has been entered electronically in the record of the United States Bankruptcy Court for the Northern District of Ohio.**



Dated: October 1 2012

Mary Ann Whipple
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | Case No.: 11-36312 |
| | ) | |
| William Edsel Robinson and | ) | Chapter 7 |
| Monica Marie Robinson, | ) | |
| | ) | Adv. Pro. No. 12-3017 |
| Debtors. | ) | |
| | ) | Hon. Mary Ann Whipple |
| Lawrence E. Robinson, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| William E. Robinson, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OF DECISION**

    This adversary proceeding is before the court for decision after trial on a complaint filed by Plaintiff to determine the dischargeability of debt under 11 U.S.C. § 523(a)(4) ("Complaint") [Doc. # 1]. Defendant is a debtor in the underlying Chapter 7 case pending in this court. The district court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §1334(b) as a civil proceeding arising in a case under Title 11. This proceeding has been referred to this court by the district court under its general order of reference.

28 U.S.C. § 157(a); General Order 2012-7 of the United States District Court for the Northern District of Ohio. Proceedings to determine the dischargeability of debts are core proceedings that the court may hear and decide. 28 U.S.C. § 157(b)(1) and (b)(2)(I).

This Memorandum of Decision constitutes the court's findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52, made applicable to this adversary proceeding by Fed. R. Bankr. P. 7052. Regardless of whether specifically referred to in this Memorandum of Decision, the court has examined the submitted materials, weighed the credibility of the witnesses, considered all of the evidence, and reviewed the entire record of the case. Based upon that review, and for the reasons discussed below, the court finds that Plaintiff is entitled to judgment in his favor in the amount of $33,300.00.

## FINDINGS OF FACT

Plaintiff is 62 years old, [*see* Pl. Ex. 3, p. 4], and Defendant is Plaintiff's nephew. On October 27, 2005, Plaintiff executed a Durable Power of Attorney for Financial Management ("POA"), naming Defendant as his attorney-in-fact. [ Pl. Ex. 1]. The POA gave Defendant general authority to do any act that Plaintiff could do in dealing with Plaintiff's financial matters. At the time the POA was executed, Plaintiff was recovering from physical injuries he sustained in an automobile accident. At that time, he was also experiencing financial difficulties in that he had a large amount of unpaid medical bills. According to Plaintiff, neither he nor Defendant consulted an attorney, and the POA was obtained by downloading it from the internet.

The parties' testimony differs as to Plaintiff's purpose in executing the POA. According to Plaintiff, he executed the POA because he had been in an automobile accident and was on medication. However, Plaintiff testified that he did not need Defendant to handle his affairs and that he paid his own bills and otherwise handled his own financial affairs at the time. Defendant agreed that Plaintiff was physically and mentally capable of handling his own financial affairs at all relevant times. Defendant testified that Plaintiff was expecting a large personal injury settlement and executed the POA because "he did not want creditors to be able to get the money." The court credits Defendant's testimony, having observed the parties testify and finding Defendant's testimony more consistent with the parties dealings thereafter. The circumstances surrounding purchase of a motor vehicle for Plaintiff with the settlement funds, described below, and the fact that it still remains titled in Defendant's name, corroborate Defendant's testimony about the purpose of the POA arrangement.

Specifically, in February 2006, Plaintiff received a personal injury settlement check in the amount

of $94,866.90. On February 17, 2006, Plaintiff accompanied Defendant to Empire Affiliates Credit Union, where both he and Defendant had an account. The check was deposited into an account held in the name of Defendant and his wife. While at the credit union, both Plaintiff and Defendant signed the settlement check, Defendant signing in the presence of Plaintiff. Plaintiff was not debilitated, mentally or physically, at the time of the transaction. He was able to drive and to accompany Defendant to the credit union. Plaintiff testified that he knew the settlement funds were being deposited into Defendant's bank account.

After depositing the funds, Defendant purchased a 2002 Ford Escape at Plaintiff's request. The parties shopped together for the vehicle. The Ford Escape was purchased for Plaintiff's use and has been in his possession since its purchase. However, at Plaintiff's request, the vehicle was titled in Defendant's name and Defendant has paid $100.00 per month for insurance for the vehicle. Given the nature of the parties' dealings and Plaintiff's admitted financial difficulties at the time, the court finds it more likely than not that Plaintiff's intent in turning over his personal injury settlement check to Defendant was to protect those funds from his creditors. The fact that the POA was not necessary for Defendant to act on Plaintiff's behalf with respect to the personal injury settlement funds since they were deposited in an account in Defendant's name does not convince the court otherwise. The parties did not consult an attorney and had no special training in finances or the law. They simply downloaded the POA from the internet. There is no testimony or evidence that they understood when a power of attorney was necessary and when it was not necessary in handling the settlement funds for Plaintiff. In any event, it is clear that Plaintiff intended that Defendant deposit the settlement check into Defendant's credit union account and, thus, that Defendant had authority to do so.

In addition to the purchase of the Ford Escape for Plaintiff, Defendant withdrew significant sums of cash for Plaintiff and at Plaintiff's request over the course of approximately two months. The cash was used by Plaintiff in part to provide loans to his girlfriend and other family members. Although neither Plaintiff nor Defendant have written records of the settlement fund disbursements, the parties agree that by April 5, 2006, Plaintiff had asked for, and Defendant had given Plaintiff, approximately $51,000.00 of the settlement funds. Also, by that date, Defendant does not dispute that he personally had used the balance of the settlement funds, approximately $43,866.00. Defendant testified that he was building a new house and borrowed the funds to complete the house. He acknowledged that he took it upon himself to borrow the money without consulting Plaintiff but credibly testified that he intended to repay the money by borrowing against the equity in the house. Although the parties' personal relationship is ruptured now, the

court heard from both parties of family affection between the two of them over time that also showed the court that Defendant did not intend to hurt his uncle financially. At the time Defendant built the house, he had obtained an appraisal of $250,000 and planned to refinance after it was completed. He had applied and was pre-approved for a home equity loan. However, when the house was appraised, a downturn in the housing market resulted in a drop in the value of the house, and Defendant had no equity against which to borrow.

Defendant, nevertheless, continued to give Plaintiff money when he asked for it, using his own personal funds. However, at some point in time before Defendant learned that his house did not appraise high enough to support a home equity loan as anticipated, in response to Plaintiff's request to withdraw funds on his behalf, Plaintiff told him that he had invested the remaining settlement funds in a certificate of deposit. Defendant testified that he had not actually done so but, believing that he could repay the money that he had borrowed when he obtained the home equity loan, did not want Plaintiff to worry about the money.

Defendant testified that Plaintiff had previously told him that he could borrow money from the settlement funds deposited in his account. However, the court credits Plaintiff's testimony that he never granted Defendant such authority. Had Plaintiff granted Defendant permission to borrow from those funds, Defendant would have had no need to lie about investing the funds in a certificate of deposit. Eventually, in July 2008, Defendant told Plaintiff that he did not have the balance of his settlement funds and that he had used the money to complete his house.

Plaintiff testified that he kept a record in a notebook of the settlement funds left in Defendant's custody until July 2008 when he learned Defendant had used those funds, at which time he testified that he threw the notebook away. He nevertheless testified that Defendant currently owes him $43,000, which was the approximate balance owed on April 5, 2006. While Defendant does not dispute that he owed Plaintiff $43,000 as of April 5, the court credits Defendant's testimony that he continued to give Plaintiff money even after Defendant had depleted the settlement funds. Defendant admitted to owing Plaintiff $35,000.00 as of March 1, 2011.[1] In addition, he testified, and Defendant does not dispute, that he has continued to pay

---

[1] Defendant had filed a prior Chapter 13 case, Case No. 10-35188, and Plaintiff had commenced an adversary proceeding seeking a determination of nondischargeability of the debt at issue in this proceeding, Adv. No. 10-3247. On March 1, 2011, Defendant testified at a hearing held by the court on Plaintiff's motion for default judgment in that adversary proceeding that he owed Plaintiff $35,000.00. At trial in this proceeding, Defendant acknowledged the accuracy of that testimony.

approximately $100.00 per month for car insurance for the Ford Escape used by Plaintiff but still titled in Defendant's name.

## LAW AND ANALYSIS

Plaintiff alleges that Defendant's use of the settlement funds was an act of fraud and defalcation while acting in a fiduciary capacity and that the debt is nondischargeable under § 523(a)(4). [Doc. # 8, Complaint, ¶¶ 12 -13]. A § 523(a)(4) claim must be proven by a preponderance of the evidence. *R.E. America, Inc. v. Garver (In re Garver)*, 116 F.3d 176, 178 (6th Cir. 1997). Section 523(a)(4) excepts from discharge any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." Although Plaintiff's complaint appears to rely only on the fraud or defalcation while acting in a fiduciary capacity prong of § 523(a)(4), he also argued that the embezzlement or larceny prongs apply in this case. The court will, therefore, discuss all three prongs.

### A. Embezzlement and Larceny

Embezzlement and larceny are defined and determined according to federal law. *Graphic v. Grim (In re Grim)*, 293 B.R. 156, 165-66 (Bankr. N.D. Ohio 2003). For purposes of § 523(a)(4), larceny is defined as "the fraudulent and wrongful taking and carrying away of the property of another with intent to convert such property to the taker's use without the consent of the owner." *Id.* (citing *Schreibman v. Zanetti-Gierke (In re Zanetti-Gierke),* 212 B.R. 375, 381 (Bankr. D. Kan. 1997)). Embezzlement is defined as "the fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come." *Brady v. McAllister (In re Brady)*, 101 F.3d 1165, 1172-73 (6th Cir. 1996). Embezzlement differs from larceny in that the embezzler's initial acquisition of the property is lawful. Because the misappropriated funds at issue in this case were lawfully obtained by Defendant when Plaintiff entrusted the funds to him for deposit in Defendant's credit union account, the court addresses dischargeability of a debt resulting from embezzlement rather than larceny.

A creditor proves embezzlement by establishing that (1) he entrusted his property to the debtor or debtor lawfully obtained the property, (2) the debtor appropriated the property for a use other than that for which it was intended, and (3) the circumstances indicate fraud. *Id*. at 1173. The evidence shows that Plaintiff entrusted the settlement funds at issue to Defendant and that Defendant used the funds in a manner other than as was intended by Plaintiff, thus establishing the first and second elements of an embezzlement claim. However, Plaintiff has not met his burden as to the third element, that is, that the circumstances indicate fraud.

5

The "fraud" required under § 523(a)(4) is "'fraud in fact, involving moral turpitude or intentional wrong,' for the purpose of permanently depriving another of his property." *Gen. Motors Acceptance Corp. v. Cline (In re Cline)*, 431 B.R. 307 (Table), *7 (B.A.P. 6th Cir. 2010) (quoting *Cash Am. Fin. Servs., Inc. v. Fox (In re Fox)*, 370 B.R. 104, 116 (B.A.P. 6th Cir. 2007)). The court credits Defendant's testimony that before he used the settlement funds, he had been preapproved for a home equity loan subject to an adequate appraisal when his home was completed and that he intended to repay the settlement funds used by him to finish his home when he received the loan. He did not intend to permanently deprive Plaintiff of those funds. Unfortunately, a downturn in the housing market resulted in his failed repayment plan. Mere negligence, even if characterized as gross negligence, is not the same thing as fraud. *LaMacchia v. Tarbell (In re Tarbell)*, 440 B.R. 668, 675 (Bankr. W.D. Pa. 2010); *In re Davis*, No. 08-25004-CMB, Adv. No. 11-2194-CMB, 2012 Bankr. LEXIS 3552 at *9 (Bankr. W.D. Pa. Aug. 2, 2012). While Defendant had no authority to use the funds as he did, the court does not believe he did so with the fraudulent intent to take money from his uncle without repaying it. That Defendant later told Plaintiff the funds had been invested in a certificate of deposit does not convince the court otherwise. Defendant credibly testified that he told Plaintiff that lie so that Plaintiff would not worry about the money, still believing that he was going to obtain the loan money to replace the funds used by him. While the court does not condone such conduct, it nevertheless finds that Defendant did not act with fraudulent intent in appropriating Plaintiff's funds for use in completing his home.

### B. Defalcation While Acting In A Fiduciary Capacity

A failure to show circumstances indicating fraud does not, however, defeat a claim for defalcation while acting in a fiduciary capacity. *See Patel v. Shamrock Floorcovering Servs., Inc. (In re Patel)*, 565 F.3d 963, 970 (6th Cir. 2009) (agreeing that defalcation while acting in a fiduciary capacity need not rise to the level of fraud). "Defalcation" while acting in a fiduciary capacity is a distinct ground for exception from discharge under § 523(a)(4). *In re Tarbell*, 440 B.R. at 675. The Sixth Circuit has defined defalcation to include a misappropriation of funds by a fiduciary, "so long as the use was not the result of mere negligence or a mistake of fact." *Patel*, 565 F.3d at 970. "A debt is non-dischargeable as the result of defalcation when a preponderance of the evidence establishes: (1) a pre-existing fiduciary relationship, (2) a breach of that relationship, and (3) resulting loss." *Id.* at 968.

The Sixth Circuit has adopted a narrow interpretation of "fiduciary" as used in § 523(a)(4). *R.E. America, Inc. v. Garver (In re Garver)*, 116 F.3d 176, 179 (6th Cir. 1997). In order to trigger the defalcation

6

provision in that statute, a debtor must hold funds in a trust for the benefit of a third party. *Id.* at 179. Furthermore, the types of trusts that will trigger the defalcation provision of § 523(a)(4) are "limited to only those situations involving an express or technical trust relationship arising from placement of a specific res in the hands of the debtor." *Id.* at 180.

While the existence of a fiduciary relationship for purposes of § 523(a)(4) is determined by federal law, *Commonwealth Land Title Co. v. Blaszak (In re Blaszak)*, 397 F.3d 386, 390 (6th Cir. 2005), the determination of whether an express or technical trust exists is governed by state law, *Chapman v. Pomainville (In re Pomainville)*, 254 B.R. 699, 702 (Bankr. S.D. Ohio 2000); *see Capitol Indemnity. Corp. v. Interstate Agency, Inc.(In re Interstate Agency, Inc.)*, 760 F.2d 121, 124 (6th Cir. 1985). Under Ohio law, "[a]n express trust is 'a fiduciary relationship with respect to property, arising as a result of a manifestation of an intention to create it and subjecting the person in whom the title is vested to equitable duties to deal with it for the benefit of others.'" *Gabel v. Richley*, 101 Ohio App.3d 356, 362-63 (1995) (quoting 5 Scott on Trusts § 462.1, at 310 (4th ed.1967)). A formal trust agreement is not necessary; rather, a trust can be shown to exist from the circumstances surrounding its creation. *Ulmer v. Fulton*, 129 Ohio St. 323, 339-40 (1935) (stating that "a trust is the right, enforceable in equity, to the beneficial enjoyment of property, the legal title to which is in another. The one who creates the trust is said to settle it on another, and bears such designations as 'donor,' 'settlor,' or 'trustor.' He to whom the property is given in trust and in whom the legal title vests is named the trustee. The one for whose benefit the trust is created is called the cestui que trust, or beneficiary. And the property given in trust is called the subject-matter, or trust res."). In order to establish the existence of an express trust, a plaintiff must demonstrate (1) an intent to create a trust, (2) a trustee, (3) a trust res, and (4) a definite beneficiary. *Blaszak,* 397 F.3d at 391; *see Ulmer,* 129 Ohio St. at 339-340.

The execution of a power of attorney does not alone create the fiduciary relationship required under § 523(a)(4). *See Silver Care Center v. Parks (In re Parks)*, No. 05-2774, 2007 WL 2033380, *14-15, 2007 Bankr. LEXIS 2372, *45-49 (Bankr. D.N.J. July 10, 2007); *Bast v. Johnson (In re Johnson),* 174 B.R. 537, 541 (Bankr. W.D. Mo. 1994). Nevertheless, the court finds sufficient evidence of an express trust of which Defendant was the trustee and a breach of the resulting fiduciary relationship. The evidence shows that Plaintiff intended to create a trust in that he intended to transfer his personal injury settlement funds (the trust res) to Defendant (the trustee) with the understanding that Defendant was to hold those funds for the benefit and at the direction of Plaintiff (the beneficiary). The evidence also shows that Defendant breached

7

his fiduciary duty when he misappropriated a portion of those funds held by him in trust by borrowing trust funds to complete work on his house without Plaintiff's consent and then initially lying to the beneficiary to cover up what he had done. And finally, Plaintiff has suffered damages in that the funds have not been repaid. Plaintiff is, therefore, entitled to judgment on his nondischargeability claim based on Defendant's defalcation while acting in a fiduciary capacity.

**C. Damages**

The Sixth Circuit authorizes bankruptcy courts to enter money judgments in actions seeking to except debts from discharge. *Longo v. McLaren (In re McLaren)*, 3 F.3d 958, 966 (6th Cir. 1993). In his prayer for relief, in addition to entry of judgment excepting the debt owed from Defendant's discharge, Plaintiff seeks compensatory damages in the amount of $43,000.00, punitive damages in the amount of $43,000.00, and attorney fees in the amount of $57,333.33. Plaintiff bears the burden of proving damages by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291 (1991) ("The party seeking the exception to discharge bears the burden of proof on each element of its claim by a preponderance of the evidence.").

There is no dispute that Defendant had given Plaintiff approximately $51,000.00 of the settlement funds by April 5, 2006, leaving a balance owed of approximately $43,000.00. However, the court credits Defendant's unrebutted testimony that he continued to give Plaintiff money when requested by him after April 4, 2006, at which time Defendant had depleted the balance of the settlement funds. Nevertheless, Plaintiff threw away any record of the transactions relating to the settlement funds that he had in 2008 and Defendant did not keep a record of those transactions. Although it is Plaintiff's burden to prove his damages, and the evidence is otherwise insufficient to accurately calculate damages in his favor, Defendant admits that he owed Plaintiff $35,000.00 as of March 1, 2011. There is also no dispute that Defendant has on Plaintiff's behalf continued to pay approximately $100.00 per month for car insurance for the Ford Escape purchased for Plaintiff, or an additional $1,700.00 since March 1, 2011. The court thus finds that Plaintiff is entitled to compensatory damages in the amount of $33,300.00, or $35,000.00 less the $1,700.00 car insurance payments made on Plaintiff's behalf since March 1, 2011.

Plaintiff also requests punitive damages and attorney fees, arguing that punitive damages and attorney fees are proper in cases of theft and fraud. However, as discussed above, Plaintiff presented no evidence showing that Defendant acted with fraudulent intent to permanently deprive his father's brother of his money. Rather, the evidence convinces the court that Defendant borrowed the settlement funds with

the intent to repay them by refinancing his home. Moreover, even if Defendant's acts constituted theft or fraud while acting in a fiduciary capacity, Plaintiff would not be entitled to punitive damages.

Under Ohio law, punitive damages are warranted only where actual malice is shown. *Preston v. Murty*, 32 Ohio St. 3d 33, 336 (1987); *Moskovitz v. Mt. Sinai Med. Ctr.*, 69 Ohio St. 3d 638, 652 (1994). "[A]ctual malice, necessary for an award of punitive damages, is (1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, or (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm." *Preston*, 32 Ohio St. 3d at 336. "A possibility or even probability [of harm occurring] is not enough." *Id.* Rather, actual malice requires a finding that the probability of harm occurring is great. *Id.* "Malice of the "conscious disregard" variety [also] requires higher culpability than acting 'knowingly' under the Ohio criminal code." *Spalding v. Coulson*, No. 70524, 1998 WL 564054, * 16, 1998 Ohio App. LEXIS 4105, *54 (Ohio App. Sept. 3, 1998); *see* Ohio Rev. Code § 2901.22(B) ("A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature"). Even in the case of fraud, the Ohio Supreme Court has held that, in order to be awarded punitive damages, a party "must establish not only the elements of the tort itself, but, in addition, must either show the fraud is aggravated by the existence of malice or ill will, or must demonstrate that the wrongdoing is particularly gross or egregious." *McCullough v. Spitzer Motor Ctr., Inc.*, 108 Ohio App. 3d 530, 534 (1996) (quoting *Charles R. Combs Trucking, Inc. v. Int'l Harvester Co.*, 12 Ohio St. 3d 241 paragraph three of syllabus (1984)).

In this case, Plaintiff has failed to present any evidence from which the court could conclude that Defendant acted with actual malice in using the settlement funds to complete work on his home. Defendant's testimony, which the court finds credible, that he intended to refinance his home after its completion and use the equity that he believed would exist at that time to repay the settlement funds that he borrowed falls far short of the actual malice necessary for an award of punitive damages. And as the court found above, Defendant instead evidenced at trial affection for his uncle, who notwithstanding what has happened continues to trust his nephew to pay for the insurance on the Ford Escape.

With respect to attorney fees, generally, under the "American Rule," which applies to litigation in the bankruptcy courts, a prevailing litigant may not collect attorney fees from his opponent unless authorized by federal statute or an enforceable contract between the parties. *In re Sheridan*, 105 F.3d 1164, 1166 (7th Cir. 1997). There must, therefore, be a statute, a contract or other specific rule of common law

authorizing an award of attorney's fees. *See Travelers Cas. & Sur. Co. of America v. Pacific Gas & Electric Co.*, 549 U.S. 443, 448 (2007). The court does not find any legal or factual basis for an award of attorney's fees to Plaintiff.

There is no basis in the Bankruptcy Code for an award of attorney's fees to a creditor successfully prosecuting a § 523(a)(4) claim. *Cf.* 11 U.S.C. § 523(d)(debtors shall be awarded attorney's fees in certain circumstances not present here). Nothing in § 523(a)(4) indicates that Congress intended the prevailing party to be awarded fees.

Under Ohio law, the Ohio Supreme Court has clearly stated that attorney's fees are only appropriately awarded where punitive damages are warranted. *Galmish v. Cicchini*, 90 Ohio St. 3d 22, 35 (2000) (agreeing that the appropriateness of awarding attorney fees is dependent upon the propriety of the award for punitive damages and finding that "[a]ttorney fees may be awarded as an element of compensatory damages where the jury finds that punitive damages are warranted."). The record must support a finding that the legal standard for punitive damages could have been met. As discussed above, the court finds that the evidence does not establish the sort of malice on Defendant's part necessary to justify an award of punitive damages beyond his basic liability for defalcation while acting in a fiduciary capacity; thus, attorney fees are not warranted.

Moreover, Rule 7008(b) of the Federal Rules of Bankruptcy Procedure provides: "A request for an award of attorney's fees shall be pleaded as a claim in a complaint, cross-claim, third-party complaint, answer, or reply as may be appropriate." Thus, attorney's fees must be sought in a bankruptcy adversary proceeding by a separate count of the complaint or other pleading and not merely in the prayer for relief. *E.g.*, *Leonard v. Onyx Acceptance Corp.*, Nos. 02-8125, Civ. 03-1117 ADM, 2003 WL 1873283, at *2 (D. Minn. Apr. 11, 2003); *Citibank USA, N.A. v. Spring (In re Spring)*, Nos. 03-35552 (LMW), 04-3007 (LMW), 2005 WL 588776, at *6 (Bankr. D. Conn. Mr. 7, 2005); *Garcia v. Odom (In re Odom)*, 113 B.R. 623, 625 (Bankr. C.D. Cal. 1990); *see V.M. v. S.S. (In re S.S.)*, 271 B.R. 240, 244 (Bankr. D.N.J. 2002). Plaintiff's complaint does not include a count setting forth a claim for attorney's fees; rather, that request is included only in the prayer for relief.

## CONCLUSION

For the foregoing reasons, Plaintiff is entitled to judgment of non-dischargeability on his claim brought under 11 U.S.C § 523(a)(4) based on Defendant's defalcation while acting in a fiduciary capacity in the amount of $33,300.00. However, Plaintiff has failed to meet his burden of proving entitlement to punitive damages and attorney fees. The court will enter a separate judgment in accordance with this

10

memorandum of decision.

###